| ANTOINETTE WASHINGTON | * | NO. 2021-CA-0080 |
|---|---|---|

ANTOINETTE WASHINGTON     *     NO. 2021-CA-0080

VERSUS     *

    COURT OF APPEAL

BRIAN TAYLOR, ELKHART     *
CORPORATE CLEANING     FOURTH CIRCUIT
SERVICE, INC. AND     *
MOTORISTS MUTUAL     STATE OF LOUISIANA
INSURANCE COMPANY     * * * * * * *

CONSOLIDATED WITH:           CONSOLIDATED WITH:

STEPHANIE MYLES AND           NO. 2021-CA-0081
TAQUILLA WHITE

VERSUS

BRIAN TAYLOR, ELKHART
CLEANING SERVICE,
MOTORIST MUTUAL
INSURANCE COMPANY, STATE
FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2015-04213, DIVISION "J"
Honorable D. Nicole Sheppard,
* * * * * *
**Judge Terri F. Love**
* * * * * *

(Court composed of Judge Terri F. Love, Judge Edwin A. Lombard, Judge Roland L. Belsome, Judge Daniel L. Dysart, Judge Sandra Cabrina Jenkins)

**BELSOME, J., DISSENTS FOR THE REASONS ASSIGNED BY JUDGE JENKINS**
**JENKINS, J., DISSENTS WITH REASONS**

Darleen M. Jacobs
Al A. Sarrat
Rene' D. Lovelace
THE LAW OFFICES OF DARLENE M JACOBS
823 St. Louis Street
New Orleans, LA 70112-3415

     COUNSEL FOR PLAINTIFF/APPELLEE, STEPHANIE MYLES

Isaac H. Ryan
DEUTSCH KERRIGAN & STILES, L.L.P.
755 Magazine Street
New Orleans, LA 70130

COUNSEL FOR DEFENDANT/APPELLANT, BRIAN TAYLOR, ELKHART CORPORATE CLEANING SERVICE, AND MOTORISTS MUTUAL INSURANCE COMPANY

**REVERSED AND RENDERED**
**January 26, 2022**

*TFL*

*EAL*

*DLD*

This appeal arises from a minor vehicle accident. Plaintiff was a passenger in one of the vehicles and filed suit. After a second trial, the trial court found that the driver of the vehicle carrying plaintiff was ten percent at fault and the other driver was ninety percent at fault and awarded damages accordingly. The driver found to be ninety percent at fault appealed, contending that a second trial should not have been granted, that the record did not support a finding of ninety percent fault, that the trial court did not independently allocate fault, and that there was no evidence to support medical expenses.

Our review of the record reveals that the amended judgment was absolutely null, such that the trial court did not abuse its discretion by granting a new trial. However, the trial court committed legal error by not independently determining the apportionment of fault. After our *de novo* review of the second trial, we find that plaintiff failed to prove by a preponderance of the evidence that the driver of the other car was at fault or that she suffered compensable injuries. We reversed the judgment of the trial court and find in favor of defendants, dismissing plaintiff's claims.

*FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

On March 3, 2015, Brian Taylor was driving a vehicle owned by his company, Elkhart Corporation Cleaning Service, Inc. ("Elkhart"), on Rousseau Street and started to make a left turn across Jackson Avenue. Antoinette Washington approached Jackson Avenue from the opposite direction. Ms. Washington was driving with two guest passengers, Stephanie Myles[1] and Taquilla White.[2] The two automobiles collided.

Ms. Washington filed a Petition for Damages against Mr. Taylor, Elkhart, and Motorist Mutual Insurance Company ("MMIC") (collectively "Defendants"), as the insurer of the other vehicle. Ms. Myles and Ms. White also filed a Claim for Damages against Defendants and State Farm Mutual Automobile Insurance Company ("State Farm"), as Ms. Washington's insurer. The two cases were consolidated.

After a one-day bench trial, the trial court found that plaintiffs failed to establish Mr. Taylor's liability or that they suffered compensable injuries. The judgment was rendered in favor of Defendants and dismissed plaintiffs' lawsuits. The trial court issued reasons for judgment, which provided the following:

> Considering the language of the Statute and testimony, Ms. Washington has an obligation to yield the right of way to Mr. Taylor because he had already entered the intersection from Rousseau Street and was in the process of turning when she preceded into the intersection. Mr. Taylor also testified that he was the first person to arrive at the intersection, that he came to a complete stop, observed traffic and was certain that his right of way was clear prior to proceeding. The Court finds that this testimony, in light of the evidence presented, is the most accurate depiction of the events that occurred. The Court also notes, Taquilla White

_____

[1] Ms. Washington's sister.
[2] Ms. Washington's niece.

2

notified plaintifs' [sic] counsel after trial commenced that she would not be in attendance. As such, Ms. White's claims were not considered.

Ms. Myles and Ms. White filed a Motion for New Trial because the judgment failed to mention State Farm, as Ms. Washington's insurer, in that the trial court's reasons for judgment found Ms. Washington at fault for the accident. Thus, the trial court issued an amended judgment to add that the judgment was also rendered in favor of State Farm and that the claims against State Farm were dismissed.

Ms. Myles and Ms. White filed a Motion for New Trial contending that the trial court erred by substantively amending the initial judgment in contravention with La. C.C.P. art. 1951.[3] Prior to the hearing on the Motion for New Trial, a new trial court judge took over the matter. The new trial court judge held a hearing on the Motion for New Trial and reasoned as follows:

> In the (inaudible) matter, plaintiffs do not argue that they have discovered new evidence since the trial that would be important to their cause. In fact, plaintiffs again re-urged the sufficiency of the evidence that was presented in [sic] initial trial.
> Additionally, the original trial was a bench trial, so plaintiffs do not seek a new trial based on improper behavior of a jury. Plaintiff instead, argues that the judgment of this court and original proceeding appears clearly contrary to the law and the evidence. In support of its argument, plaintiffs point out that the court found Ms. Washington at fault for the accident, as such, plaintiff [sic] contend that her liability insurer State Farm is liable for her negligence. However, the trial judge in the original proceeding found that there to [sic] be

---

[3] La. C.C.P. art. 1951 Amendment of judgment (version effective at time of trial court's action):

> On motion of the court or any party, a final judgment may be amended at any time to alter the phraseology of the judgment, but not its substance, or to correct errors of calculation. The judgment may be amended only after a hearing with notice to all parties, except that a hearing is not required if all parties consent or if the court or the party submitting the amended judgment certifies that it was provided to all parties at least five days before the amendment and that no opposition has been received.

insufficient evidence presented to warrant the award of damages.

In the original trial only Ms. Miles [sic] provided testimony regarding the extent of her injuries, testifying that she has sustained injuries that prevented her from conducting daily activities with ease. However, she also testified that she had been in an accident three months prior to the subject accident, again while riding in Ms. Washington's car. This contrasts with Ms. Washington's testimony at trial that her Nissan Altima had never been in an accident, and her damage to her vehicle was caused by the collision with Mr. Taylor.

The court finds that the original trial judge made a credibility of determination based on the testimony of evidence provided in the original proceeding. Plaintiffs argue that certified medical records and prescription list were submitted for both Ms. White and Ms. Miles [sic]. However, the court still concluded that this was insufficient evidence of damages. Accordingly, the judgment of the court in the original proceedings did not appear to be contrary to the law and the evidence.

\*          \*          \*

This court finds no such grounds that would warrant a new trial. After review of the record and the judgment at issue, the court is convinced that the same determinations would be made in a new proceeding.

Additionally, it should be noted that Ms. White failed to appear at the original trial and present her case. Therefore, considering the record and applicable law, this court finds that the plaintiff's [sic] motion for new trial is hereby denied.

And I just kind of want to point out. Obviously you guys know that you were before a different judge in that particular matter. However, I think that based on our review of the record and everything that was presented, I believe that the credibility of the witnesses was a big determination on why that particular judge ruled in that favor. But based on the law, I haven't been presented with anything that would allow a motion for new trial.

\*          \*          \*

As far as the amended judgment, I'll have to go back and look at that. I have to go back. And then sometimes what we've had to do with judgment that were signed by Judge Johnson, I would usually contact him and find out what was his process and what was his thought pattern on what was going on.

\*          \*          \*

So on your particular case, I'll contact him and see which judgment was most accurate for him because I don't have

4

> a copy of the transcript on what was actually said. And, of course, I wasn't there. So I'll contact him and see if I can get any information from him. And if I can, then I'll communicate that back to you. And it we can't, then I'll set you guys for a status conference, so that we can have the correct judgment as it relates to the case.

Subsequently, however, and contrary to the above-quoted transcript, the trial court issued a judgment granting Ms. Myles, solely, a new trial.

Following the granting of Ms. Myles a new trial, Ms. Washington filed a Motion for Devolutive Appeal from the first trial court's judgment, amended judgment, and the new trial court's judgment granting Ms. Myles a new trial. This Court dismissed Ms. Washington's appeal as untimely. *Washington v. Taylor*, 19-0924, 19-0925 (La. App. 4 Cir. 6/17/20), ___ So. 3d ____, 2020 WL 3264070.

The trial court signed Ms. Myles' proposed judgment, which awarded Ms. Myles $14,000.00 in general damages plus $5,134.51 for medical expenses for a total of $19,134.51. The judgment allocated ninety percent fault to Mr. Taylor, $17,221.06, and ten percent fault, $1,913.45, to Ms. Washington.

Defendants filed a Motion for New Trial contending that the judgment was clearly contrary to the law and evidence. During the hearing on the Motion for New Trial, the following colloquy occurred:

> DEFENSE COUNSEL: Your Honor, on behalf of the Defendant, Brian Taylor, we just would like the Court to provide some reasons for us as to why the second trial came out 90 percent on Brian Taylor. The first trial came out a hundred percent on Antoinette Washington. And we
> COURT: And, counsel, wait. Let me -- let me stop you right there.
> (OVERLAPPING SPEAKERS)
> COURT: So when we looked at -- when we looked at that allegation, I didn't say anything about anybody. What -- I didn't allocate a 90 percent so I wasn't sure how was that... I don't know if somebody assumed that. And then when you guys -when judge -- when judgments are prepared, I am a person who believes that a 9.5

5

should always be attached with compliance with the law.

So a judgment was prepared; and, if the judgment is prepared and it's circulated and a 9.5 is attached, if -- if somebody does that, then, as an officer of -- of the Court, I'm believing that they did what that rule provides. So I got a judgment; a 9.5 was attached. And so, because the 9.5 was attached, and I didn't get any indication from my staff telling me that somebody opposed the language in the judgment, then I executed the judgment; so I'm inclined to meet with you guys and discuss amending the judgment, if there's the allegation of error.

But, if the judgment was circulated and nobody opposed the judgment and then I get the judgment, I signed it based on the 9.5 being attached, and no one -- no one, you know, attesting to it. And then when we get – I'm sorry, disputed. When we get disputed judgments, I if one side prepares and then it's a dispute, then I go back and I look at my notes. My staff will look at their notes. And then we'll see if the judgment is compliant with what was said in court. And so, if it's still disputed, then we advise attorneys to obtain a transcript because that's what the law says.

In this particular case, once we got this motion for the motion for new trial, I looked at my notes and my staff looked at their notes, and I didn't say anything about 90 percent. But when the judgment was presented for signature, that – that issue was never raised. So I'm willing to... And I think it's appropriate to look at amending the judgment, but I don't think it's appropriate for a motion for new trial.

\*　　　　\*　　　　\*

DEFENSE COUNSEL: Yes, Your Honor. I sent a letter to the Court on November 15th, 2019. I have it stamped as received by your division November 18th, 2019. Also, Mr. Lovelace submitted a judgment which said that my client was 90 percent at fault. I wrote a letter to Mr. Lovelace on December 19th, 2019, objecting to that judgment and submitting my own judgment. And Mr. Lovelace's Rule 9.5 certificate notes my objection saying that I objected to the judgment because it is wholly inconsistent with the law and evidence. So, you know, there was -- it was pretty clear that there was a dispute about the application of fault of the parties.

The trial court later issued a judgment denying Mr. Taylor's Motion for New Trial and reasons therefor. Defendants' timely Motion for Suspensive Appeal followed.

Defendants allege four errors on appeal: 1) the trial court was arbitrary in

granting Ms. Myles a new trial; 2) trial court's signing Ms. Myles' proposed judgment was a gross departure from proper judicial proceedings; 3) the allocation of ninety percent fault to Mr. Taylor was clearly wrong; and 4) no evidence supported $5,134.51 in medical expenses.

## STANDARD OF REVIEW

"Appellate courts review factual determinations made by the trial court using the manifest error or clearly wrong standard of review." *Urology Clinic of New Orleans, Inc. APMC v. United Fire & Cas. Co.*, 08-0444, p. 2 (La. App. 4 Cir. 9/10/08), 993 So. 2d 803, 806. "Reversing the trial court's factual findings requires that we find that no reasonable factual basis exists for the trial court's findings and that the findings are wrong or 'manifestly erroneous' according to the record." *Id.*, 08-0444, p. 3, 993 So. 2d at 806. In other words, we are precluded from "setting aside of a district court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety." *Hall v. Folger Coffee Co.*, 03-1734, p. 9 (La. 4/14/04), 874 So. 2d 90, 98. "Thus, a reviewing court may not merely decide if it would have found the facts of the case differently." *Id.*

"'However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable.'" *Fornerette v. Ward*, 10-1219, p. 4 (La. App. 4 Cir. 5/11/11), 66 So. 3d 516, 520 (quoting *Evans v. Lungrin*, 97-0541, 97-0577, pp. 6-7 (La. 2/6/98), 708 So. 2d 731, 735). "'A legal error occurs here when a trial court applies incorrect principles of law and such errors are prejudicial.'" *Fornerette*, 10-1219, p. 4, 66 So. 3d at 520 (quoting *Hamp's Constr., L.L.C. v. Hous. Auth. of New Orleans*, 10-0816, p. 3 (La. App. 4 Cir. 12/1/10), 52 So. 3d 970, 973). "'Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights.'"

7

*Fornerette*, 10-1219, p. 4, 66 So. 3d at 520 (quoting *South East Auto Dealers Rental Ass'n, Inc. v. EZ Rent To Own, Inc.*, 07-0599, p. 5 (La. App. 4 Cir. 2/27/08), 980 So. 2d 89, 93). "When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts *de novo*." *Evans*, 97-0541, p. 7, 708 So. 2d at 735.

"The applicable standard of review regarding a motion for new trial is whether the trial court abused its discretion." *Nola E., LLC v. Sims*, 18-0623, p. 4 (La. App. 4 Cir. 2/13/19), 265 So. 3d 1147, 1150.

## GRANT OF MOTION FOR NEW TRIAL AFTER FIRST TRIAL

Defendants contend that the trial court's judgment granting Ms. Myles a new trial was "arbitrary and capricious."

Ms. Myles was granted a new trial on May 31, 2019. Defendants now suspensively appeal the second bench trial final judgment rendered on December 21, 2020. We must determine whether this Court has jurisdiction to consider the assignment of error regarding the granting of Ms. Myles' Motion for New Trial in 2019.

### Jurisdiction

"It is well-settled that judgments in Louisiana are 'either interlocutory or final.'" *Jacobs v. Metzler-Brenckle*, 20-0585, 20-0607, p. 12 (La. App. 4 Cir. 5/26/21), 322 So. 3d 347, 356 (quoting *Sullivan v. Malta Park*, 16-0875, p. 2 (La. App. 4 Cir. 1/31/17), 215 So. 3d 705, 707). "The distinction between interlocutory judgments and final judgments is that a final judgment determines the merits of an action in whole or in part, while an interlocutory judgment decides only

8

preliminary matters in the course of the action." *Jacobs*, 20-0585, 20-0607, p. 12, 322 So. 3d at 356.

"A final judgment is appealable in all causes in which appeals are given by law, whether rendered after hearing, by default, or by reformation under Article 1814." La. C.C.P. art. 2083. However, "[a]n interlocutory judgment is only appealable when expressly provided by law." *Jacobs*, 20-0585, p. 13, 322 So. 3d at 356.

Therefore, we must determine the category for a judgment granting a motion for new trial. This Court previously found that "[i]t is obvious that a judgment which merely grants a new trial does not determine any of the merits; such a determination is made following the new trial which has been granted." *Pate v. Crescent Motors Exch., Inc.*, 256 So. 2d 471, 472 (La. App. 4th Cir. 1972). Further, this Court stated "where the motion for a new trial has been timely filed a judgment granting a new trial is not appealable." *Id.* Moreover, the Fifth Circuit, in persuasive guidance, provided that "[o]ur jurisprudence further provides that an order granting or denying a new trial is not appealable, but is reviewable under the appellate courts' supervisory jurisdiction for abuse of discretion." *Alvarez v. LeBlanc*, 08-247, p. 4 (La. App. 5 Cir. 9/30/08), 996 So. 2d 517, 519.

The trial court's granting of Ms. Myles' Motion for New Trial was not a judgment determining the merits, in whole or in part, and was not certified as a final judgment. Therefore, it is not a final, appealable judgment. The judgment is interlocutory, but the record does not contain an indication that Defendants sought supervisory review. However, when reviewing an unrestricted appeal from a final judgment, this Court may review and consider interlocutory judgments. *Nola E., LLC*, 18-0623, p. 4, 265 So. 3d at 1150; *New Orleans Fire Fighters Pension &*

9

*Relief Fund v. City of New Orleans*, 17-0320, p. 5 n.12 (La. App. 4 Cir. 3/21/18),

242 So. 3d 682, 688 n.12.  Accordingly, we have jurisdiction to determine whether

the trial court abused its discretion by granting Ms. Myles a new trial.

### *Granting Ms. Myles a New Trial*

"A new trial may be granted, upon contradictory motion of any party or by

the court on its own motion, to all or any of the parties and on all or part of the

issues, or for reargument only."  La. C.C.P. art. 1971.  A new trial is mandatory,

upon contradictory motion, for the following reasons:

> (1) When the verdict or judgment appears clearly
> contrary to the law and the evidence.
> (2) When the party has discovered, since the trial,
> evidence important to the cause, which he could not, with
> due diligence, have obtained before or during the trial.
> (3) When the jury was bribed or has behaved improperly
> so that impartial justice has not been done.

La. C.C.P. art. 1972.  Further, "[a] new trial may be granted in any case if there is

good ground therefor, except as otherwise provided by law."  La. C.C.P. art. 1973.

The initial trial court judgment stated:

> After consideration of the testimony, law and
> evidence, as well as the arguments of counsel, the Court
> finds in favor of the defendants, Brian Taylor and Elkhart
> Corporate Cleaning Service, Inc. and Motorists Mutual
> Insurance Company and against the plaintiffs, Antoinette
> Washington, Stephanie Myles, and Taquilla White.
> Specifically, the Court holds that the plaintiffs failed to
> establish that the defendant, Brian Taylor, was liable for
> the damages incurred and that they suffered injuries that
> would warrant compensation.
> **IT IS HEREBY ORDERED, ADJUDGED AND
> DECREED** that judgment is rendered in favor of
> Defendants, Attorney for Defendants, Brian Taylor,
> Elkhart Corporate Cleaning Service, Inc. and Motorists
> Mutual Insurance Company and dismisses plaintiffs'
> lawsuit, and assesses costs against the plaintiffs.

Ms. Myles and Ms. White filed a Motion for New Trial asserting that the judgment

was clearly contrary to the law and evidence and alleging that State Farm should be cast in judgment, as State Farm was not included in the original judgment.[4] Without conducting a contradictory hearing or ruling on the Motion for New Trial, the trial court issued an amended judgment, which added in State Farm with the other previously listed defendants.

At this juncture, a new trial court judge assumed the case and conducted a hearing on the Motion for New Trial, wherein all parties examined the trial court's ability to amend the judgment.

La. C.C.P. art. 1951 provided, at the time, that:

> On motion of the court or any party, a final judgment may be amended at any time to alter the phraseology of the judgment, but not its substance, or to correct errors of calculation. The judgment may be amended only after a hearing with notice to all parties, except that a hearing is not required if all parties consent or if the court or the party submitting the amended judgment certifies that it was provided to all parties at least five days before the amendment and that no opposition has been received.

"Thus, a judgment may be amended by the court only when the amendment takes nothing from or adds nothing to the original judgment." *Tunstall v. Stierwald*, 01-1765, p. 4 (La. 2/26/02), 809 So. 2d 916, 920. "Changing the name of a party cast in the judgment is a change of substance and not of phraseology." *Id.*, 01-1765, p. 5, 809 So. 2d at 920. "Although the error may have appeared obvious to the parties and the court, the change should not have been accomplished by the court's own motion, but should have been done contradictorily." *Id.*, 01-1765, p. 6, 809 So. 2d at 920.

While most jurisprudence holds that changing the name of a party cast in

---

[4] No assertions regarding newly discovered evidence were made.

11

judgment is an alteration of substance, this Court also stated that "rewriting a judgment to include additional parties clearly adds to the judgment and is therefore substantive." *Paragon Lofts Condo. Owners Ass'n, Inc. v. Paragon Lofts, L.L.C.*, 10-0419, p. 2 (La. App. 4 Cir. 1/14/11), 55 So. 3d 970, 972. *See also Freeman v. Zara's Food Store, Inc.*, 16-0445, p. 14 (La. App. 4 Cir. 11/2/16), 204 So. 3d 691, 700 ("The general rule is that an amendment to add a party to a judgment is a change of substance, not of phraseology, that can only be accomplished by motion for a new trial or on appeal"). Further, this Court noted "[t]here are three methods by which a trial court can make a substantive change in a judgment: 1) the timely motion for new trial; 2) timely appeal; or 3) petition or action for nullity." *Id.* "When the trial court does not follow the one of the prescribed methods for making a substantive amendment to a judgment, the amended judgment is an absolute nullity." *Id.*, 10-0419, pp. 2-3, 55 So. 3d at 972-73.

Although the addition of State Farm as a prevailing party defendant was not the addition of a party cast in judgment, this Court's jurisprudence holds that rewriting a judgment to add a party name is a substantive change. As such, the trial court's amended judgment was an absolute nullity. If appealed, this Court would have been bound to vacate the amended judgment and reinstate the trial court's original judgment. *See Ducombs v. Nobel Ins. Co.*, 03-1704 (La. App. 4 Cir. 7/21/04), 884 So. 2d 596. As the amended judgment was an absolute nullity, we cannot find that the trial court abused its discretion by granting the Motion for New Trial. Instead of reinstating or amending the original judgment, the trial court granted Ms. Myles a complete new trial.[5]

---

[5] The second trial court judge stated at the hearing on the Motion for New Trial that no grounds existed to warrant the granting of a new trial. However, the trial court judge concluded that she

## SECOND TRIAL

Defendants' remaining assignments of error pertain to Ms. Myles' second trial as follows: 1) the trial court erred by signing Ms. Myles' proposed judgment; 2) the allocation of fault was clearly wrong; and 3) there was no evidence to support Ms. Myles' award of $5,134.51 for medical expenses.

### Allocation of Fault

We first examine the issue of signing Ms. Myles' proposed judgment, as the result is dispositive. "The allocation of fault between comparatively negligent parties is a finding of fact." *Sims v. State Farm Auto. Ins. Co.*, 98-1613, p. 2 (La. 3/2/99), 731 So. 2d 197, 199. As such, the fault should be allocated by the factfinder, which, in this case, was the trial court judge.

Defendants filed a Motion for New Trial from the judgment allocating 90% fault to Mr. Taylor and 10% fault to Ms. Washington. During the hearing on their Motion for New Trial, the trial court revealed that she did not determine the allocation of fault, but instead, let the parties decide. She believed the parties agreed on the allocation contained in Ms. Myles' proposed judgment, as outlined below:

> DEFENSE COUNSEL: Your Honor, on behalf of the Defendant, Brian Taylor, we just would like the Court to provide some reasons for us as to why the second trial came out 90 percent on Brian Taylor. The first trial came out a hundred percent on Antoinette Washington. And we
>
> COURT: And, counsel, wait. Let me -- let me stop you right there.
>
> (OVERLAPPING SPEAKERS)

---

would have to conduct further research and review regarding the legality of the amended judgment. The trial court's judgment granted Ms. Myles a new trial without reasons. This Court can glean from the record that the new trial was granted because of the amended judgment, as the trial court judge stated she would have decided the matter the same as the initial trial court judge.

COURT: So when we looked at -- when we looked at that allegation, I didn't say anything about anybody. What -- I didn't allocate a 90 percent so I wasn't sure how was that... I don't know if somebody assumed that. And then when you guys -when judge -- when judgments are prepared, I am a person who believes that a 9.5 should always be attached with compliance with the law.

So a judgment was prepared; and, if the judgment is prepared and it's circulated and a 9.5 is attached, if -- if somebody does that, then, as an officer of -- of the Court, I'm believing that they did what that rule provides. So I got a judgment; a 9.5 was attached. And so, because the 9.5 was attached, and I didn't get any indication from my staff telling me that somebody opposed the language in the judgment, then I executed the judgment; so I'm inclined to meet with you guys and discuss amending the judgment, if there's the allegation of error.

But, if the judgment was circulated and nobody opposed the judgment and then I get the judgment, I signed it based on the 9.5 being attached, and no one -- no one, you know, attesting to it. And then when we get – I'm sorry, disputed. When we get disputed judgments, I if one side prepares and then it's a dispute, then I go back and I look at my notes. My staff will look at their notes. And then we'll see if the judgment is compliant with what was said in court. And so, if it's still disputed, then we advise attorneys to obtain a transcript because that's what the law says.

In this particular case, once we got this motion for the motion for new trial, I looked at my notes and my staff looked at their notes, and I didn't say anything about 90 percent. But when the judgment was presented for signature, that – that issue was never raised. So I'm willing to... And I think it's appropriate to look at amending the judgment, but I don't think it's appropriate for a motion for new trial.

*         *         *

DEFENSE COUNSEL: Yes, Your Honor. I sent a letter to the Court on November 15th, 2019. I have it stamped as received by your division November 18th, 2019. Also, Mr. Lovelace submitted a judgment which said that my client was 90 percent at fault. I wrote a letter to Mr. Lovelace on December 19th, 2019, objecting to that judgment and submitting my own judgment. And Mr. Lovelace's Rule 9.5 certificate notes my objection saying that I objected to the judgment because it is wholly inconsistent with the law and evidence. So, you know, there was -- it was pretty clear that there was a dispute

14

about the application of fault of the parties.

We find the trial court committed legal error by not independently determining the apportionment of fault between the parties. We also find that this legal error was prejudicial to Defendants, in that relying upon Ms. Myles' proposed judgment skewed fault against Mr. Taylor. Accordingly, this Court will conduct a *de novo* review of the record. *See Evans*, 97-0541, p. 9, 708 So. 2d at 736; *In re Helm*, 11-0914, pp. 6-7 (La. App. 4 Cir. 12/21/11), 84 So. 3d 607, 611.[6] "Applying *de novo* review, the appellate court independently views the record, without granting any deference to the trial court's findings, to determine the preponderance of the evidence." *Banks v. Children's Hosp.*, 13-1481, p. 13 (La. App. 4 Cir. 12/17/14), 156 So. 3d 1263, 1272.

### *TESTIMONY*

#### *Testimony of Brian Taylor*

Mr. Taylor testified that at the time of accident, he was the owner of Elkhart and was driving a company-owned truck pulling a thirty-two foot long trailer. Being from Michigan, he was not familiar with the area. Mr. Taylor stated that he approached Jackson Avenue on Rousseau Street and stopped at the stop sign, as follows:

> I stopped, turned on my signal. You got to wait -- I waited a little bit for traffic to clear. I had to make sure that traffic was -- because I'm pulling a trailer, I got to make sure the traffic is clear long enough to for me to get through that intersection and then I pulled out into the intersection.

---

[6] This contrasts with finding that a trial court was clearly wrong in its allocation of fault, which would require this Court to "adjust the award . . . to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion.'" *Medice v. Delchamps, Inc.*, 96-1868, pp. 4-5 (La. App. 4 Cir. 4/30/97), 694 So. 2d 528, 530 (quoting *Clement v. Frey*, 95-1119, pp. 7-8 (La. 1/16/96), 666 So. 2d 607, 611).

He testified that he was in the intersection at Rousseau and Jackson Avenue making a left turn onto Jackson Avenue when the collision occurred and described the collision:

> When I entered into the intersection and I was going -- a car pulled up and appeared to stop at the stop sign, so I continued then being in the intersection.
> I continued to go ahead and start turning. I looked back, as I turned to make sure my wheels turned, I looked forward and the car had pulled out.

On cross-examination, when asked if he saw the vehicle driven by Ms. Washington, he stated, "[t]here was no car at the stop when I entered the intersection." During cross-examination, Mr. Taylor responded thusly:

> A: Right before the accident occurred, when I looked to clear — to make sure I would clear the median then right before that, there was a car that pulled up to the stop sign. It appeared to stop.
> I looked to make sure that I would clear the median and I started my turn and that's when the car pulled out.
> Q: But then as you were in the process of attempting to make your turn, that's when you first became aware of the Nissan vehicle; is that correct?
> A: When I was in the intersection, the car -there was a car that came up to the stop sign directly in front of me and stopped, appeared to stop, and that's when I started my turn.

### Testimony of Detective Williams

Detective Williams was called to the accident scene to investigate. Det. Williams stated that Ms. Washington's two passengers were Ms. White and Ms. Myles. Det. Williams did not issue any citations in conjunction with the investigation because the parties gave "conflicting statements." Det. Williams did not take statements from Ms. White or Ms. Myles. The diagram drawn by Det. Williams indicated that Mr. Taylor's vehicle was "past the middle point, past the

16

neutral ground on Jackson."  No one was injured, no one sought medical transport, and there was "[v]ery minor damage to both vehicles."

***Testimony of Antoinette Washington[7]***

Ms. Washington stated that she was travelling eastbound on Rousseau Street approaching Jackson Avenue when she stopped at a stop sign and proceeded to move straight through the intersection.  When asked by her own counsel about how the collision occurred, the following colloquy took place:

> A: I stopped to see if someone was coming before I pulled out.
> Q: Did your Silverado then turn Silverado [sic] then turn left into your vehicle?
> A: Yes.
> Q: When you started pulling forward, had the Silverado started to turn left?
> A: Yes.
> Q: When you started pulling forward -- after you stopped?
> A: Yes, ma'am.
> Q: After you stopped, had the Silverado started to turn left?
> A: Yes. Wait, wait, say that again.
> Q: When you started pulling forward, had the Silverado start to turn left?
> A: Wait. I don't understand what you are saying.
> Q: When you started - -
> A: When I stopped to see if anything was coming, nothing wasn't coming, so I proceeded to pull out.
> Q: Was it at that time that your vehicle was struck?
> A: Yes.
> *          *          *
> Q: Was he in the process of making a left turn at the time of the accident?
> A: Ma'am, his vehicle was, like I say, coming into the intersection but I had to the right-of-way.
> Q: That's not what I asked you. I asked was the other vehicle in the process of making a left turn?
> A: I didn't see him. He didn't have his signal on.
> Q: Was he turning? Did he have to turn left?
> A: I'm assuming because he couldn't go straight

---

[7] A large portion of Ms. Washington's testimony is quoted verbatim herein, as the testimony is crucial to the outcome of this matter.

because on Rousseau it's just a one-way coming out. So I knew he couldn't go straight.

On cross-examination, the following testimony was elicited:

Q: Did you see the other vehicle, Mr. Taylor's vehicle, before the impact occurred?
A: Yes.
Q: And when was it that you first saw Mr. Taylor's vehicle?
A: When I was at the stop sign, he was coming from the other way, from the way I was on.
Q: So, while you were stopped at the stop sign, you saw Mr. Taylor's vehicle?
A: He had the truck with the long trailer, yes.
Q: What was Mr. Taylor's vehicle doing when you first saw it?
A: It was coming across the median.
Q: Did you see a blinker on Mr. Taylor's vehicle?
A: No, I did not.
Q: Had Mr. Taylor began to turn when you proceeded from the stop sign?
A: When I proceeded from the stop sign? I can't quite remember, but I know when I stopped and he was -- you know, when I stopped -- wait, okay?

When I stopped at the stop sign, when I looked to see if anything was coming, nothing was coming, and that's when I had the right to pull out because I wouldn't have pulled out if I saw anything coming.
Q: But was but you never did see Mr. Taylor's blinker before the accident occurred?
A: No, I did not. I didn't pay attention. I had just pulled out when I didn't anything coming.

       *       *       *

Q: Ms. Washington, when you pulled up, stopped at the stop sign, where was Mr. Taylor's truck and trailer?
A: I can't remember exactly. He was coming from the opposite side.
Q: He had already come over at that time, correct?
A: No, he had not. He was coming over.
Q: When you pulled up?
A: When I pulled up, and I stopped at the stop sign, which I normally do, because when I'm driving from there – I'm coming from that way all the time.

I have to stop because Jackson Avenue is a busy street. I'm not going to drive no car and go straight over the median without stopping.

So, I stopped at the stop sign what I was supposed to do, and when I had a clear way, I proceeded to come over.

Q: At the time that you stopped at the stop sign, he had already come over, correct?

A: If he had already come over, I would have ran into his car.

Q: Do you recall me asking you, when you pulled up, was he still stopped at the stop sign?

A: I cannot recall what I told you the last time, sir. I'm telling you now what I know and what I remember.

Q: Do you recall testifying at the trial of this matter about a year ago?

A: Do I recall what I testified?

Q: Yes, ma'am.

A: I can't recall everything that I said. No, I can't.

       *        *        *

Q: Ms. Washington, I'd like you to review this testimony?

       *        *        *

Q: Ms. Washington, I asked you, "When you pulled up, was he still stopped at the stop sign?" What was your response?

A: Read what you said on there?

Q: I'll read the question. "When you pulled up, was he still stopped at the stop sign?" And what was your answer?

A: I can't remember. I told you I couldn't remember what I told you last time, but I know what I'm saying now.

Q: Doesn't the transcript of the trial testimony from a year ago say, "No, he was not stopped at the stop sign. That's what I'm telling you. He had done come over." Isn't that what you testified to?

MS. JACOBS: I'm going to object. You can read it and clearly you can read what she says.

       *        *        *

Q: Ms. Washington, if I can capture a moment in time, when you were at the stop sign, isn't it true that Mr. Taylor was in the middle of Jackson Avenue coming across towards you?

A: No.

Q: Do you recall when you testified in this case 1 a year ago. I'll ask you to, please, turn to the next page?

A: I told you I - -

THE COURT:

Ms. Washington, you got to remember - -

Q: Please turn to the next page, page 125 of your testimony from a year ago, and I asked you at the top of

the page. "**QUESTION**: If I can capture a moment in time you were at the stop sign stopped?" And you answered: "**ANSWER**: Right. "**QUESTION**: He is in the middle of Jackson Avenue coming across toward you? "**ANSWER**: Yes." Do you recall that testimony?

A: I can't recall.

Q: Are you now saying he was not in the middle of Jackson?

A: Sir, I'll say it again, when I stopped at the stop sign, when I was clear to go then I pulled out. I'm not going to sit here and say what you want me to say.

Q: I'm not asking - -

A: Yes, you is. I told you, I can't remember and I can't recall.

THE COURT:

The only thing you have to do is answer his questions. If he asks you a question, then you can answer, but you can't make statements and you can't ask him questions.

A: I can't recall what you said. [to counsel]

Q: Ms. Washington, when you stopped at the stop sign there was a pick up truck and a 30-foot long trailer in the intersection at that time?

A: Why would I pull out?

THE COURT:

Ms. Washington, you just got to answer it. You can say "yes" or "no" or if you don't remember, but you got to say - -

A: Yeah, I don't remember. Say it again, sir. [to counsel]

Q: At the time you were stopped in the stop sign, there was a pickup truck and a 30-foot long trailer in the intersection at that time?

A: I can't recall what you are saying.

Q: You knew Mr. Taylor had to turn, didn't you?

A: He didn't have a signal on, sir. But I knew he had to turn, because, like I say, going to Rousseau Street you cannot go that way because it's a one way, only going out. I know he wasn't going t9 [sic] come in. I know he had to turn.

But, when he saw that I was coming over, I thought he was going to wait until I come over. I didn't know he was going to turn.

Q: You did see his truck?

A: I told you I saw the truck. But, I can't exactly say exactly at what point -- you know what I'm saying? I can't say that, but I know I saw the truck.

When I proceeded to come out, they did not have nothing coming.

Q: So, when you left the stop sign, you are saying there was no car in the intersection anywhere?

A: I wouldn't have never pulled out if there was a car in the intersection.

Q: I'm asking you a question. Were there any cars anywhere in the vicinity?

A: His car was coming across. They didn't have nothing coming out Jackson Avenue.

Q: His car was coming across?

A: That was a long trailer, yes, so I'm assuming he was going to wait until I get over the median. He had to yield.

Q: Is there any reason why you wouldn't wait?

A: Why would I wait when I had the right? I had the right of way. I was at the stop sign first.

I had the right to go if I didn't have no other incoming traffic, if it wasn't coming all the way for me to turn it. Why wouldn't I go out? Why wouldn't I proceed to leave?

Q: Ma'am, you were at the stop sign?

MS. JACOBS:

Objection. Counsel is being argumentative.

THE WITNESS:

I'm at the stop sign. When I'm at the stop sign -- if I'm at the stop sign I have a right to go. You are saying I shouldn't have left? I should have waited until he came?

THE COURT:

Ms. Washington, he's going to ask you another question and you can answer.

Q: Ms. Washington, is there any reason why you couldn't have waited at the stop sign for Mr. Taylor to complete his turn before you pulled out?

A: I didn't have to wait when I had the right of way.

The estimated damage to Ms. Washington's vehicle was $2,745.00.

### *Testimony of Stephanie Myles*

Ms. Myles, the sister of Ms. Washington, was the front seat passenger at the time of the accident. She stated that Ms. Washington stopped at the stop sign and that Mr. Taylor's vehicle had not yet reached the opposite stop sign. Ms. Myles asserted that she hit her head during the impact and injured her back, neck, shoulder, and head. She sought treatment at Advance Medical Center. She was discharged from treatment on May 9, 2016, but contends she continues to

experience pain "[a]ll over."  Ms. Myles' medical bill from Advance Medical Center was $3,873.00 and her prescription bill was $1,261.51.

Ms. Myles was involved in another vehicular accident[8] on December 22, 2014, less than three months prior to the accident at issue.  She was injured in the first accident and treated with the Advance Medical Center for her head, shoulder, and back.  On cross-examination, Ms. Myles admitted that she was treated for injuries from the first accident on the morning of the present accident.  Ms. Myles also stated that when her treating physician discharged her in May 2016, she was told not to return for treatment because the physician discovered Ms. Myles forged a tramadol prescription by changing the amount of pills from 35 to 85.  Ms. Myles stated that the prescription was changed, but that she "didn't do it."

Further, Ms. Myles testified as follows:

> Q: Ms. Miles [sic], do you remember when we took your deposition at Ms. Jacobs' office?
> A: Yes.
> Q: Do you remember being sworn in by the court reporter and giving testimony under oath?
> A: Yes.
> Q: Do you recall, I asked you the question: "**QUESTION**: Okay. And when you approached the intersection of Jackson Avenue, where was the truck driven by Mr. Taylor?" And your answer:
> A: He was coming through the stop sign. We had made it to the stop sign already.
> Q: What was your answer, ma'am, on March 20th, 2017, please, read the part that I have highlighted.
> A: I don't understand what you want.
> Q: Did you answer: "**ANSWER**: He looked look he -- he was -- he was just coming across."
> A: I didn't say that. I didn't say that. I know that street so good. We live there all our life.
> Q: So, you deny –
> MS. JACOBS:

---

[8] The first accident also occurred while Ms. Myles was a passenger in Ms. Washington's automobile.

That's not the whole answer, Your Honor. I'm going to object. He should read the whole answer.

Q: Okay. Did you testify – "He looked like he -- he was -- I think he was just coming across to cross"?

A: He hadn't made it to the stop sign.

Q: "He never had got crossed over to Jackson Avenue." Was that your answer?

A: Yes, I guess. I don't know.

*      *      *

Q: Ms. Miles [sic], were you still in pain from the December 2014 accident when this March 2015 accident occurred?

A: I was just getting better and then it got worse. I got in an accident in March. It got worse.

Q: So, my question is not whether you had gotten better or whether treatments you had, had helped but were you still in any pain from the December accident when this March accident happened?

A: No.

Q: So, the morning of this March 2015 accident, you no longer had any pain from that December 2014 accident?

A: I don't know. It could have brought it back. The accident -- it could have brought it back because it got worse.

Q: Well, in order for pain to get worse, that means it has to have been there; is that correct?

A: It was I was just getting healed from that, from my accident in December.

Q: You already established that you went to Dr. Kavinsky, the morning of this March 2015 accident. Do you remember establishing that?

A: Yes.

Q: So, why would you go to the doctor the morning of this accident, this March 2015 accident, if you were better?

A: If I was better?

Q: If you were healing and you were better, why did you go and establish care at a new doctor?

A: I was getting much better and when I got in this other accident and it got worse.

Q: That's not - -

A: I was better but it got worse. It was like three months and then I had the another one.

Q: Why would you go to a new doctor to establish care the morning of our accident if you were better already from the previous accident?

A: I can't recall.

23

> Q: Do you recall filling out in-take sheets at Dr. Kavinsky's office the morning of our accident, March of 2015?
> A: I can't recall. That's been a while.
>
>         \*        \*        \*
>
> Q: Can you look at these three pages and tell me if you recognize that as the in-take sheet that was filled out when you went to Dr. Kavinsky's office for the first time on March 3rd, 2015?
> A: Yes.
> Q: And I wanted to specifically ask you about the bottom of page 74. Is that your signature there?
> A: Yes, it is.
> Q: And on the bottom of page 75, is that your signature?
> A: Yes.
> Q: And you read me the date that is on the bottom of [sic] page?
> A: March the 13th.
> Q: Say that again?
> A: March 13th --
> Q: Is it March the 13th or is it March the 3rd?
> A: March the 3rd.
> Q: And from your understanding that's the day that this accident happened?
> A: Yes.
> Q: Did you also have a right shoulder pain at the time -- from the December 2014 accident?
> A: Did I have pain in my shoulder? Yes.

When questioned again by other opposing counsel about the reasoning for her being discharged from treatment, Ms. Myles denied knowing the reason.

"After having stopped [at a stop sign], the driver shall yield the right-of-way to all vehicles which have entered the intersection from another highway or which are approaching so closely on said highway as to constitute an immediate hazard." La. R.S. 32:123(B). "The jurisprudence indicates that stopping is only half the duty, the other half is not to proceed until the determining that the way is clear." *Toston v. Pardon*, 03-1747, p. 15 (La. 4/23/04), 874 So. 2d 791, 802.

Our review of the testimony and evidence presented at the second trial results in similar findings as the initial trial. Regardless of whether Mr. Taylor

utilized his turn signal, Ms. Washington testified that she knew Mr. Taylor had to make a left turn. However, she proceeded into the intersection. Ms. Washington also testified that Mr. Taylor was already entering the intersection when she pulled out, but she recanted, and was then confronted with prior inconsistent statements. When confronted, Ms. Washington stated that she could not remember what her previous testimony was, but that she did not "have to wait" at the stop sign because she "had the right of way."

Ms. Myles testified that she was in another vehicular accident less than three months prior to the accident at issue. She was still being treated for injuries sustained in that accident. In fact, she received treatment for those injuries the morning of the accident at issue. When questioned as to whether Mr. Taylor's vehicle was already in the intersection when Ms. Washington began to drive away from the stop sign, Ms. Myles was confronted with prior inconsistent statements and then could not recall her testimony.

Based on the evidence and testimony presented, we find that Ms. Myles failed to establish by a preponderance of the evidence that Mr. Taylor was at fault. Similarly, we find that Ms. Myles failed to establish that she suffered compensable injuries as a result of the accident at issue, which renders Ms. Washington's fault irrelevant.[9] Therefore, we reverse the judgment of the trial court and render judgment in favor of Defendants,[10] dismissing Ms. Myles' lawsuit.

### *DECREE*

---

[9] Ms. Myles' medical records contained a few notations from Advanced Medical Center that her injuries were caused by both the December vehicular accident and the accident at issue. However, the records do not delineate between what injuries were allegedly caused by the accident at issue and the previous accident. Ms. Myles offered no additional corroborating evidence.

[10] The trial court judgment referenced State Farm, but State Farm is not a party to the appeal.

For the above-mentioned reasons, we find that the trial court did not abuse its discretion by granting Ms. Myles a new trial, as the amended judgment was absolutely null. However, we find that the trial court committed legal error by not independently determining the allocation of fault between the parties. As such, we reviewed the record *de novo* and found that Ms. Myles failed to prove by a preponderance of the evidence that Mr. Taylor was at fault or that she suffered compensable injuries. Accordingly, the judgment of the trial court is reversed and rendered.

**REVERSED AND RENDERED**